KILPATRICK TOWNSEND & STOCKTON LLP
LARRY W. McFARLAND (State Bar No. 129668)
lmcfarland@ kilpatricktownsend.com
DENNIS L. WILSON (State Bar No. 155407)
DWilson@kilpatricktownsend.com
DAVID K. CAPLAN (State Bar No. 181174)
dcaplan@kilpatricktownsend.com
CHRISTOPHER T. VARAS (State Bar No. 257080)
CVaras@kilpatricktownsend.com
9720 Wilshire Blvd PH
Beverly Hills, CA  90212-2018
Telephone:   310-248-3830
Facsimile:    310-860-0363

Attorneys for Plaintiffs
SHOWTIME NETWORKS INC.,
HOME BOX OFFICE, INC.,
MAYWEATHER PROMOTIONS, LLC, and
TOP RANK, INC.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SHOWTIME NETWORKS INC., HOME BOX OFFICE, INC., MAYWEATHER PROMOTIONS, LLC, and TOP RANK, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN DOE 1 d/b/a boxinghd.net, JOHN DOE 2 d/b/a sportship.org and d/b/a "Carlo Magno", and JOHN DOES 3-10 inclusive, <br><br> Defendants. | Case No. 2:15-CV-03147 <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

1

2

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................. 1

II.     RELEVANT FACTS ............................................................................ 1

        A.      Plaintiffs' Rights .................................................................... 1

        B.      Defendants' Anticipated Willful Infringement of
                Plaintiffs' Rights in the Coverage ......................................... 3

        C.      Plaintiffs' Efforts to Communicate with Defendants ............ 6

        D.      The Anticipated Irreparable Harm to Plaintiffs .................... 8

III.    ARGUMENT ....................................................................................... 9

        A.      This Court has Jurisdiction Over Plaintiffs' Claims ............. 9

                1.      This Court has Subject Matter Jurisdiction ............. 9

                2.      This Court has Personal Jurisdiction over
                        Defendants ............................................................. 11

        B.      The Standard for Issuance of a Temporary
                Restraining Order and Preliminary Injunction to
                Prevent Copyright Infringement ......................................... 15

        C.      Plaintiffs are Entitled to a Temporary Restraining
                Order and Preliminary Injunction to Prevent
                Defendants from Infringing their Rights in the
                Coverage .............................................................................. 17

                1.      Plaintiffs are Likely to Succeed on their Claims ... 17

                2.      Plaintiffs will Suffer Irreparable Harm if the
                        Court does not Grant Immediate Relief .................. 21

                3.      The Balance of Equities Tips Sharply in
                        Plaintiffs' Favor ..................................................... 22

                4.      An Injunction is in the Public Interest ................... 22

                5.      The Scope of Plaintiffs' Requested Injunction
                        is Reasonable and Within the Court's
                        Discretion ............................................................... 23

        D.      The Court Should Require No Bond or, in the
                Alternative, a Minimal Bond .............................................. 24

        E.      Defendants Have Received Notice and *Ex Parte*
                Relief is Warranted ............................................................. 25

IV.     CONCLUSION .................................................................................. 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001) ................................................................. 17, 20

*Apple Computer, Inc. v. Franklin Computer Corp.,*
    714 F.2d 1240 (3rd Cir. 1983) ........................................................................ 23

*Bancroft & Masters, Inc. v. Augusta Nat'l. Inc.,*
    223 F.3d 1082 (9th Cir. 2000) ........................................................................ 14

*Barahona–Gomez v. Reno,*
    167 F.3d 1228 (9th Cir. 1999) ........................................................................ 24

*Brayton Purcell LLP v. Recordon & Recordon,*
    606 F.3d 1124 (9th Cir. 2010) ................................................................. 13, 14

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,*
    843 F.2d 600 (1st Cir. 1988).......................................................................... 22

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ................................................................. 18, 19

*Ga. Television Co. v. TV News Clips of Atlanta, Inc.,*
    718 F. Supp. 939 (N.D. Ga. 1989)................................................................. 17

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,*
    328 F.3d 1122 (9th Cir. 2003) ........................................................................ 11

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ......................................................................... 24

*Kramer Motors, Inc. v. British Leyland, Ltd.,*
    628 F.2d 1175 (9th Cir. 1980) ................................................................. 12, 13

*Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-cv-276-L,
    2007 WL 79311 (N.D. Tex. Jan. 9, 2007)..............................................passim

*Mavrix Photo, Inc. v. Brand Techs., Inc.,*
    647 F.3d 1218 (9th Cir. 2011) ............................................................. 13, 14, 15

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) ........................ 18, 22, 23

*Mission Power Eng'g Co. v. Cont'l Cas. Co.,*
    883 F.Supp. 488 (C.D. Cal. 1995).................................................................. 25

*Modtech, Inc. v. Designed Facilities Constr., Inc.,*
    51 U.S.P.Q.2d 1206 (C.D. Cal. 1999) ............................................................ 23

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997) ..................... 18

*Nat'l Photo Grp., LLC v. Allvoices, Inc.*, No. C-13-03627 JSC,
    2014 WL 280391, at *6 (N.D. Cal. Jan. 24, 2014)................................................ 19

*National Football League v. Cousin Hugo's, Inc.*,
   600 F. Supp. 84 (E.D. Mo. 1984) ........................................................... 16

*Pebble Beach Co. v. Caddy*,
   453 F.3d 1151 (9th Cir. 2006) ............................................................... 11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832, 839 n. 7 (9th Cir. 2001) ................................................. 16

*Triad Sys. Corp. v. Se. Exp. Co.*,
   64 F.3d 1330 (9th Cir. 1995) ................................................................. 22

*Twentieth Century Fox Film Corp. v. iCraveTV*,
   53 U.S.P.Q.2d 1831 (W.D. Pa. 2000) ................................................... 19

*Warner Bros. Entm't. v. WTV Sys., Inc.*,
   824 F.Supp.2d 1003 (C.D. Cal. 2011) .............................. 18, 21, 22, 23

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7, 129 S.Ct. 365 (2008) .......................................................... 16

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) ......................................................... 12, 13

**Statutes**

17 U.S.C. § 411(b) ......................................................................................... 10

17 U.S.C. § 411(c) ............................................................................ 9, 10, 17

17 U.S.C. § 501(b) ......................................................................................... 17

17 U.S.C. § 502(a) ............................................................................ 15, 17, 23

17 U.S.C. § 512(j) ......................................................................................... 24

37 C.F.R. § 201.22 ......................................................................................... 10

37 C.F.R. § 201.22(c) ..................................................................................... 11

37 C.F.R. § 201.22(d) ..................................................................................... 11

37 C.F.R. § 201.22(e) ..................................................................................... 11

Cal. Civ. Proc. Code § 410.10 ....................................................................... 11

Fed. R. Civ. P. 65(d)(2) ................................................................................. 23

**Other Authorities**

1976 *U.S. Code Cong. & Admin. News* at 5773 ........................................ 18

H.R. Rep. No. 1476, at 157-158 (1976), *reprinted in* 1976 U.S. Code Cong. &
   Admin. News 5659, 5773 ...................................................................... 10

# I.   <u>INTRODUCTION</u>

Plaintiffs Showtime Networks Inc., Home Box Office, Inc, Mayweather Promotions, LLC and Top Rank, Inc. (collectively, "Plaintiffs") file this application to prevent Defendants John Doe 1 d/b/a boxinghd.net, John Doe 2 d/b/a sportship.org and d/b/a "Carlo Magno", and John Does 3-10 inclusive (collectively, "Defendants") from unlawfully streaming Plaintiffs' copyrighted live coverage of the widely anticipated May 2, 2015 championship boxing match between Floyd Mayweather, Jr. and Manny Pacquiao.  Plaintiffs are the sole source of authorized coverage of the fight, which will be available to consumers throughout the United States on a pay-per-view basis.  Defendants operate the websites <boxinghd.net> and <sportship.org>, both of which are advertising and promoting an unauthorized and infringing live stream of Plaintiffs' coverage.

Plaintiffs provided Defendants with advance notice of their rights and demanded that Defendants stop promoting the live stream of the fight and confirm in writing that they will not stream Plaintiffs' coverage.  Defendants have not responded and have not removed the advertisement and promotion of their unauthorized distribution or performance of the fight. Plaintiffs will suffer irreparable harm if Defendants are permitted to infringe Plaintiffs' rights in this live, one-time event and, thus have no choice but to seek emergency relief from this Court.  Plaintiffs have not sued and are not seeking relief against any end users who may be planning to avail themselves of Defendants' infringing stream of the coverage.  Instead, this action focuses on two infringing websites and those anonymous defendants assisting the illegal conduct of the operators of these sites.

# II.   <u>RELEVANT FACTS</u>

## A.   **Plaintiffs' Rights**

This action relates to the coverage of the long-awaited championship boxing match between the legendary boxers Floyd Mayweather, Jr. and Manny Pacquiao, which will occur on Saturday, May 2, 2015, at the MGM Grand Garden Arena in

1  Las Vegas, Nevada (the "Fight").  The Fight is one of the most highly anticipated

2  sporting events in recent memory and has been the subject of widespread media

3  coverage and public interest.  (Declaration of Stephen Espinoza ("Espinoza Decl."),

4  ¶ 5, Ex. B.)  When the Fight was announced earlier this year, the *New York Times*

5  reported that Mayweather and Pacquiao are "widely considered [to be] two of the

6  greatest boxers of their generation," and that at stake is "the unofficial title of this

7  era's greatest pound-for-pound fighter, which many will award to the bout's

8  winner."  (*Id.*, ¶ 5, Ex. B.)

9      Much of the promotion and media attention for the Fight has centered on

10  California, which is one of the most important boxing markets in the country.

11  (Espinoza Decl., ¶¶ 5, 9, Ex. B.)  The Los Angeles press conference announcing the

12  Fight received extensive coverage in California and throughout the country.  (*Id.*, ¶

13  5, Ex. B.)  The fact that Manny Pacquiao is training for the Fight in Los Angeles has

14  also been the subject of significant media coverage, as have recent reports that he is

15  in the process of purchasing a house in Beverly Hills.  (*Id.*)  California news outlets

16  have devoted significant resources to covering the Fight.  (*Id.*)

17      The Fight will be fixed as an audiovisual recording by a single authorized

18  camera and production crew at the same time it is being transmitted live to

19  consumers throughout the world via licensed pay-per-view access.  (Espinoza Decl.,

20  ¶ 6.)  In the United States, the live transmission and/or performance is jointly

21  produced exclusively by plaintiffs HBO and Showtime.  (*Id.*)  The live transmission

22  and/or performance of the Fight and the preceding undercard bouts are referred to as

23  the "Coverage."   Plaintiffs jointly own the exclusive rights to, among other things,

24  reproduce and transmit the Coverage within the United States and elsewhere, and

25  they intend to register the copyright in the Coverage, as joint authors, within three

26  months after May 2, 2015. (*Id.*, ¶ 7.)

27      Consumers in the United States will be able to purchase licensed live pay-per-

28  view television access to the Coverage through authorized pay-per-view providers in

the range of $89.00 - $100.00, and the Coverage will begin at approximately 9:00 p.m. Eastern Time on May 2, 2015, starting with two undercard bouts and then the Fight itself, continuing until the Fight's conclusion. (Espinoza Decl., ¶ 8.) An article published on April 22, 2015, on SB Nation's MMA Mania website noted that the Fight "is expected to become the highest-grossing boxing pay-per-view (PPV) of all time." (*Id*., ¶ 5, Ex. B.) Since California is one of the most significant markets in the country for boxing events, Plaintiffs anticipate that viewership in California will be very high. (*Id*., ¶ 9.) There are no authorized online streams of the Coverage for delivery to United States audiences, including without limitation on Defendants' <boxinghd.net> and <sportship.org> websites. (*Id*., ¶ 10.)

**B.    Defendants' Anticipated Willful Infringement of Plaintiffs' Rights in the Coverage**

Defendants are seeking to benefit from this high profile, live Fight by infringing the rights of Plaintiffs. On or about April 21, 2015, Plaintiffs became aware that Defendants' <boxinghd.net> website was advertising a live Internet stream of the Coverage. (Espinoza Decl., ¶ 11.) As of the date of this writing, the home page of <boxinghd.net> bears the title "Watch Mayweather vs Pacquiao Online Free" and features the embedded graphic shown below:





1  (Declaration of Robert Brasich ("Brasich Decl."), ¶ 7, Ex. A.)  The home page also

2  states:  "[I]f you can't afford to buy tickets then simply watch Mayweather vs

3  Pacquiao here. We will provide with nothing but the freshest and the most reliable

4  high quality live links."  (*Id*.)

5       The <boxinghd.net> home page also includes a tab for "Mayweather vs

6  Pacquiao Live Streaming."  (Brasich Decl., ¶¶ 7-8, Ex. A.)  Clicking on this tab

7  takes the user to the page <boxinghd.net/mayweather-vs-pacquiao-live-streaming>,

8  bearing the same title as the tab, and including, among other things, the following

9  question and answer: "Where to Watch Mayweather vs. Pacquiao Live Streaming? .

10  . . The fight . . . will be aired via a joint pay per view by HBO and Showtime.

11  However, there are lots of alternatives that you can watch the fight live. . . . [Y]ou

12  can watch it live at home via live streaming. You can watch the full fight via live

13  stream in this website. The live streaming will commence when the fight starts."

14  (*Id.*, ¶ 8, Ex. B.)  As of April 22, 2015, this page also included a "thoughts" section

15  with comments from visitors to the site, including the following: "Hello, nice to see

16  such site being put up just for us to at least see Pacquiao fight again.  Got one slot

17  already for the free live streaming. Thanks a lot."  (*Id.*, ¶ 8, Ex. B.)

18       Clicking on the video screen or the "Start Watching!" link on the

19  <boxinghd.net> home page takes the user to the page <boxinghd.net/maypac>,

20  which includes an embedded video screen and the title "MAYWEATHER VS

21  PACQUIAO LIVE STREAMING ONLINE."  (Brasich Decl., ¶¶ 9-10, Ex. C.)  This

22  page also includes footers which read "Proudly Powered By: Free PPV Online" and

23  "© 2015 Mayweather vs. Pacquiao Live Streaming.  All Rights Reserved."  (*Id*.)

24       Both the title "MAYWEATHER VS PACQUIAO LIVE STREAMING

25  ONLINE" and the "© 2015 Mayweather vs. Pacquiao Live Streaming" portion of

26  the footer are hyperlinks.  (Brasich Decl., ¶¶ 9-10, Ex. C.)  Clicking on either of

27  those hyperlinks takes the user to Defendants' <sportship.org> website which, as of

28  April 21, 2015, appeared as shown below:

MEMORANDUM OF POINTS AND AUTHORITIES                    4
CASE NO. 2:15-CV-03147

1
2
3
4
5
6
7
8
9
10



11  (*Id.*, ¶ 10, Ex. D.)  As of April 22, 2015, <sportship.org> appeared as shown below:

12
13
14
15
16
17
18
19



20  (Brasich Decl., ¶¶ 10-11, Ex. D.)  In order to gain access to the stream, users must

21  click through one or more "offers" that promote the goods and services of third

22  parties.  (Brasich Decl., ¶ 11-12, Ex. E.)  Plaintiffs are informed and believe that

23  Defendants use these advertisements to monetize their websites.  (*Id.*)

24      As of April 22, 2015, the <sportship.org> page included a "comments"

25  section with the following comments from visitors to the site: "I go for Mayweather.

26  I want to see the fight online. Thanks for the free access. #ExcitedHere" and "I am

27  excited to watch the fight for free! Thanks for the link."  (Brasich Decl., ¶ 10, Ex.

28  D.)  In sum, the *only* content on Defendants' websites promotes and/or monetizes

1  their intention to infringe Plaintiffs' rights by streaming the Coverage without

2  Plaintiffs' authorization.  (*Id*., ¶ 14.)

3      Defendants appear to have a long history of promoting infringing streams of

4  copyrighted broadcasts of boxing matches.  Archives of <boxinghd.net> reveal that

5  Defendants have promoted streams of several other fights, including but not limited

6  to the May 4, 2013 fight between Floyd Mayweather, Jr. and Robert Guerrero, and

7  the July 12, 2014 fight between Erislandy Lara and Canelo Alvarez.  (Espinoza

8  Decl., ¶ 13, Ex. C.)  Neither of these fights were authorized to be streamed live on

9  <boxinghd.net> or anywhere else in the United States.  (*Id*.)

10     Based on public records and the work of investigators Plaintiffs have hired in

11 connection with this lawsuit, Plaintiffs understand that Los Angeles-based

12 Namecheap.com, Inc. provides domain name registration services for

13 <boxinghd.net>.  (*See* Brasich Decl., ¶¶ 15, 18, Ex. H.)  These services are required

14 to keep <boxinghd.net> accessible to members of the public.[1]  (*Id*. at ¶ 17.)  The

15 content on <boxinghd.net> appears to be hosted by one or more entities located in

16 the United Kingdom and the Netherlands.  (*Id*. at ¶¶ 15, 19, Ex. H.)

17     Plaintiffs understand that the registrar for <sportship.org> is PDR Ltd. d/b/a/

18 Publicdomainregistry in Mumbai, India, and the content on the site appears to be

19 hosted by Hostwinds, LLC in Tulsa, Oklahoma.  (Brasich Del., ¶¶ 15, 22, 23, Ex.

20 H.)  Plaintiffs do not know where Defendants intend to obtain their infringing

21 stream of the Coverage but note that streaming sites typically embed live streaming

22 video originating from one or more other unauthorized sources.  (*Id*., ¶ 5.)

**C.    Plaintiffs' Efforts to Communicate with Defendants**

24     Communicating directly with Defendants is difficult because they have

25 hidden their identities and locations from Plaintiffs and the public.  Neither

---

27 [1] Namecheap may be a domain name registration "reseller" that services its

28 customers in part by utilizing domain name registration services provided by Enom
Inc., which is located in Kirkland, Washington.  (*See* Brasich Decl., ¶ 18, Ex. K.)

1  <boxinghd.com> nor <sportship.org> contains any contact information for

2  Defendants.  (Brasich Decl., ¶ 16.)  Defendants have also concealed their true

3  identities and locations in the public Whois database, which contains (unverified)

4  name and contact information used to register Internet domain names.  (*Id.*, ¶¶ 15,

5  20, 24, Ex. H.)

6       The registrant information for <boxinghd.net> is concealed by a privacy

7  protection service that prevents Plaintiffs and the public from learning what name

8  and address Defendants used to register the domain name.  (*Id.*, ¶¶ 15, 20, Ex. H.)

9  The privacy protection service, which is located in Panama, replaces Defendants'

10  contact information with its own name and address, and provides an anonymous

11  email address that does not belong to Defendants, but on information and belief,

12  relays email messages to Defendants.  (*Id.*)

13       The Whois information for <sportship.org> includes the name "Carlo Magno"

14  and an invalid address and phone number, along with the email address

15  analouintegral@gmail.com.  (*Id.*, ¶¶ 15, 24, Ex. H.)  Plaintiffs retained a private

16  investigator who has tried diligently to locate additional information about

17  Defendants' identities or locations but has been unsuccessful.  (*Id.*, ¶¶ 15-16, 21, 25)

18       The only other contact information that Plaintiffs have located that relates to

19  Defendants is based on a link titled "DMCA" in the footer of the <sportship.org>

20  website.  (*See* Brasich Decl., ¶ 26, Ex. L.)  Clicking on that link directs users to

21  submit claims of copyright infringement to the email address dmca@gotlinks.co.

22  (*Id.*)  GotLinks.co is operated by a third party called CPAlead, LLC ("CPAlead"),

23  which claims to help its customers monetize their websites through social media

24  sharing and driving user traffic from one customer's site to another's.  (*Id.*, ¶ 27, Ex.

25  M.)  Plaintiffs do not currently have reason to believe that CPAlead is involved in,

26  or even necessarily aware of, Defendants' infringing conduct.  (*Id.*, ¶ 28.)

27       Plaintiffs have attempted to communicate with Defendants using all of the

28  contact information above.  On April 25, 2015, Plaintiffs served Defendants with an

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 2:15-CV-03147

7

1    Advance Notice of Potential Infringement (the "Notice").  Plaintiffs sent the Notice

2    to the anonymous email address for <boxinghd.net>, as well as the email addresses

3    analouintegral@gmail.com and dmca@gotlinks.co.  Plaintiffs also sent hard copies

4    of the Notice via overnight mail to Defendants' attention care of the Panamanian

5    privacy protection service and CPAlead.  (*See* Declaration of Christopher Varas

6    ("Varas Decl."), ¶ 3, Ex. A.)[2]  Among other things, the Notice advised Defendants

7    of Plaintiffs' rights and notified them that any unauthorized stream of the Coverage

8    will infringe Plaintiffs' rights.  Plaintiffs also demanded that Defendants remove all

9    references to streaming the Coverage from their websites and confirm in writing

10   within forty-eight hours that they would not stream the Coverage.  (*Id*.).  Plaintiffs

11   have received no response from any of Defendants.

12              **D.       The Anticipated Irreparable Harm to Plaintiffs**

13          Defendants' anticipated infringement will cause Plaintiffs severe and

14   irreparable harm.  (Espinoza Decl., ¶ 15.)  In distributing the Coverage and/or aiding

15   the distribution of the Coverage through unauthorized channels, Defendants will

16   unlawfully usurp the benefits of the exclusive rights of reproduction, public

17   performance and distribution, among other rights, conveyed to Plaintiffs by the

18   Copyright Act.  (*Id*.)  By providing consumers with the ability to view the Coverage

19   for free rather than paying for the Coverage through Plaintiffs' authorized channels,

20   Defendants' anticipated unlawful distribution will impair the marketability and

21   profitability of the Coverage and interfere with Plaintiffs' own authorized

22   distribution of the Coverage.  (*Id*., ¶ 16.)  This is especially true where, as here, the

23   _____

24   [2] Plaintiffs received confirmation that the email to the anonymous <boxinghd.net>
     address and the email to the <sportship.org> Whois address
25   analouintegral@gmail.com were successfully delivered to the accounts associated
     with those addresses and that the hard copy Notice addressed to "Carlo Magno" in
26   care of CPALead, LLC were delivered.  The email to dmca@gotlinks.co was
27   returned as undeliverable.  As of this filing no delivery confirmation was available
     for the hard copy Notice directed to the operator of <boxinghd.net> in care of
28   Whoisguard, Inc. in Panama.  (*See* Varas Decl., ¶¶ 4-5, Ex. B.)

work at issue is *live* Coverage of a *one-time sporting event, tickets to which sold out almost immediately and whose outcome is unknown*, which is why Plaintiffs seek the immediate relief requested herein.  (*Id.*)

Defendants' unauthorized stream also threatens to irreparably harm Plaintiffs' relationships with consumers, as well as with Plaintiffs' authorized television carriers, who rely on consumer purchases of access to the Coverage. (Espinoza Decl., ¶ 18.)   Plaintiffs' relationships with their authorized pay-per-view providers and with consumers depend on Plaintiffs' ability to control when, where, and under what conditions the Coverage is distributed.  (*Id.*, ¶ 19.)  Defendants, through their anticipated infringing conduct, undermine those relationships.  (*Id.*, ¶ 18.) Defendants' infringing stream also threatens to damage Plaintiffs' reputation with consumers, as Plaintiffs cannot exercise any quality control over Defendants' stream, which may be of inferior quality, subject to technical problems, and may suffer from other problems that consumers will mistakenly associate with Plaintiffs. (*Id.*, ¶ 19.)

Defendants' anticipated infringement not only denies Plaintiffs the benefits of their exclusive rights in the Coverage granted by the Copyright Act, but also threatens to irreparably harm Plaintiffs' valuable relationships with their authorized television carriers and with consumers.  (Espinoza Decl., ¶¶ 15-16, 18-19.)  These harms cannot be adequately compensated by monetary damages. (*Id.*, ¶ 20.)

## III.   ARGUMENT

### A.    This Court has Jurisdiction Over Plaintiffs' Claims

#### 1.    This Court has Subject Matter Jurisdiction

The Copyright Act creates federal subject matter jurisdiction over claims for copyright infringement involving a protectable work of authorship "consisting of sounds, images, or both, the first fixation of which is made simultaneously with its transmission."  17 U.S.C. § 411(c) (the "Live Broadcast Exemption").  In other words, a "copyright registration is not a prerequisite to protection of live

1   performances or broadcasts." *Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-cv-

2   276-L, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007). The legislative history is explicit

3   that the Live Broadcast Exemption is "intended to deal with the special situation

4   presented by works that are being transmitted 'live' at the same time they are being

5   fixed in tangible form for the first time. Under certain circumstances, where the

6   infringer has been given advance notice, an injunction could be obtained to prevent

7   the unauthorized use of the material included in the 'live' transmission."

8   H.R. Rep. No. 1476, at 157-158 (1976), *reprinted in* 1976 U.S. Code Cong. &

9   Admin. News 5659, 5773. "If the program content is transmitted live to the public

10  while being recorded at the same time . . . the copyright owner would not be forced

11  to rely on common law rather than statutory rights in proceeding against an

12  infringing user of the live broadcast." *Id.* at 5665-66.

13      To invoke the court's jurisdiction in a claim arising under § 411(c), the

14  plaintiff must serve the defendants with a written "Advance Notice of Potential

15  Infringement" in accordance with 37 C.F.R. § 201.22 at least 48 hours prior to the

16  beginning of the live event (the "Advance Notice"). The Advance Notice must: 1)

17  be clearly and prominently captioned "ADVANCE NOTICE OF POTENTIAL

18  INFRINGEMENT"; 2) clearly state that the copyright owner objects to the relevant

19  activities of the person responsible for the potential infringement; 3) refer to 17

20  U.S.C. § 411(b) (subsequently amended to § 411(c)) as the statutory authority on

21  which the Advance Notice of Potential Infringement is based; 4) state the date,

22  specific time, and expected duration of the intended first transmission of the work at

23  issue; 5) identify the source of the intended first transmission of the work; 6)

24  identify the work by title or by a detailed description of the work; 7) state the name

25  of at least one person or entity that will be considered the author of the work upon

26  its fixation; 8) state the identity of the copyright owner, including if appropriate a

27  general statement summarizing the means by which the copyright owner obtained

28  ownership of the copyright and the particular rights that are owned; 9) describe the

relevant activities of the person responsible for the potential infringement which would, if carried out, result in an infringement of the copyright; 10) state in clear and prominent terms that the relevant activities may, if carried out, subject the person responsible to liability for copyright infringement; and 11) declare that the copyright owner intends to secure copyright in the work upon its fixation.  37 C.F.R. § 201.22(c).  The Advance Notice must be signed by the copyright owner or the owner's authorized agent, and must include the date of signature and the full name, address, and telephone number of that person.  37 C.F.R. § 201.22(d).  Service may be effected in a variety of ways, including by personal service, first class mail or "telegram, cablegram or similar form of communication[.]"  37 C.F.R. § 201.22(e).

Plaintiffs have satisfied all of these requirements.  True and correct copies of the Advance Notice are attached to the Varas Decl. as Exhibit A.  The Notice includes all of the required statements and information, including without limitation, clear statements advising Defendants that the live stream of the Coverage that they are advertising on <boxinghd.net> and <sportship.org> will infringe Plaintiffs' exclusive rights under the Copyright Act.  Plaintiffs served the Notice on Defendants more than forty-eight hours before the Fight.  (*See* Varas Decl., ¶ 3, Ex. A.)  Service was made on every valid physical address and email address that Plaintiffs have located to communicate with Defendants.  (*See* Brasich Decl., ¶¶ 15, 20, 24, 26, Exs. H, L; Varas Decl., ¶ 3, Ex. A.)

### 2.     This Court has Personal Jurisdiction over Defendants

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006 (citation omitted).  Federal Courts in California may exercise personal jurisdiction to the extent permitted by California's long-arm statute.  *See* Cal. Civ. Proc. Code § 410.10; *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003).  The California statute "allows courts to

1   exercise personal jurisdiction over defendants to the extent permitted by the Due

2   Process Clause of the United States Constitution."  *Id.*

3        Although it would be reasonable for the Court to exercise jurisdiction over

4   Defendants based on the possibility that they may be subject to the Court's general

5   jurisdiction, but have prevented Plaintiffs from discovering that by concealing their

6   true identities and locations, here there is more than enough evidence to support the

7   exercise of specific personal jurisdiction.  The court may exercise specific

8   jurisdiction if the following conditions are met:

9        (1)  The non-resident defendant must purposefully direct his

10       activities or consummate some transaction with the forum or

11       resident thereof; or perform some act by which he purposefully

12       avails himself of the privilege of conducting activities in the forum,

13       thereby invoking the benefits and protections of its laws;  (2) the

14       claim must be one which arises out of or relates to the defendant's

15       forum-related activities; and  (3) the exercise of jurisdiction must

16       comport with fair play and substantial justice, i.e. it must be

17       reasonable.

18   *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199,

19   1205-06 (9th Cir. 2006).  The first element "may be satisfied by purposeful

20   availment of the privilege of doing business in the forum; by purposeful direction of

21   activities at the forum; or by some combination thereof."  433 F.3d at 1206.  "Even

22   a single contact . . . may support personal jurisdiction over a defendant in an action

23   arising out of that particular contact."  *Kramer Motors, Inc. v. British Leyland, Ltd.*,

24   628 F.2d 1175, 1178 (9th Cir. 1980).  Even without the benefit of discovery, more

25   than enough facts exist for the Court to conclude that Defendants have availed

26   themselves of the benefit of doing business in California, have consented to personal

27   jurisdiction in California, and have directed their infringing activities at California.

28        First, the <boxinghd.net> website relies on services provided by the Los

Angeles-based service provider Namecheap to remain operational.  Namecheap is identified in public Whois records as providing domain name registration services for <boxinghd.net>.  (*See* Brasich Decl., ¶¶ 15, 18, Ex. H.)  Domain name registration services are necessary to allow a particular domain name to be "active" on the Internet.  (*See id.*, ¶ 17.)  Not only is Namecheap located in Los Angeles, its current terms of service for domain name registration are governed by California law and explicitly require customers – including the registrant of <boxinghd.net> – to consent to personal jurisdiction in the federal courts in California.  (*Id.*, ¶ 17, Exs. I-J.)  This California contractual relationship that keeps the infringing <boxinghd.net> website online is independently sufficient for the Court to exercise specific personal jurisdiction.  *See Kramer Motors, Inc.*, 628 F.2d at 1178.

Moreover, all Defendants have also directed their infringement at California. The Ninth Circuit uses the "effects test" to determine whether personal jurisdiction exists based on infringing actions directed at the target forum.  *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010).  Under this test, jurisdiction is appropriate if the defendant:  "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Id*. quoting *Yahoo! Inc.*, 433 F.3d at 1206. All three prongs of the test are satisfied here.

With respect to the first prong of the test, there is no doubt that Defendants have engaged in an intentional act by posting websites that advertise, promote, and intend to display infringing streams of the Coverage.  *See Brayton Purcell LLP*, 606 F.3d at 1128 (creating and posting a website that allegedly infringed the plaintiff's copyright was an intentional act).

Defendants have also expressly aimed their intentional acts at California.  The Ninth Circuit has held that a nationally-accessible website is expressly aimed at a state if it "appeals to, and profits from, an audience in" that state.  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1231 (9th Cir. 2011).  In *Mavrix*, the

1   Ninth Circuit reversed the district court and ruled that even though the defendant did

2   not specifically advertise its website in California, it nevertheless expressly aimed

3   the website at California because the website was focused on the celebrity and

4   entertainment industries that have strong ties to California and consumption by

5   California consumers was "a predictable consequence of" the defendant's business

6   model. *Id*. at 1230.  *See also Brayton Purcell LLP*, 606 F.3d at 1130 (defendant "had

7   every reason to believe prospective clients in Northern California would see the

8   website – indeed, attracting new business was the point.").

9       This case fits squarely within the holdings of *Mavrix* and *Brayton Purcell*.

10  Defendants' infringing websites are devoted to infringing the Coverage of a boxing

11  match that is the subject of intense interest in California.  In addition to the fact that

12  California is a particularly important market for boxing generally, this particular

13  Fight was announced at a press conference in Los Angeles and one of the fighters is

14  training in Los Angeles and is reported to be buying a house in Beverly Hills.  There

15  can be no doubt that Defendants intend to appeal to audiences in California *and* to

16  profit from California consumers by driving them to the paid advertisements that

17  users must click through to access the infringing stream.  That satisfies the

18  "expressed aiming" element of the effects test under *Mavrix* and *Brayton Purcell*.

19      Finally, Defendants' infringement will also cause harm that they know is

20  likely to be suffered by Plaintiffs in California.  "This element is satisfied when

21  defendant's intentional act has 'foreseeable effects' in the forum."  *Brayton Purcell*

22  *LLP*, 606 F.3d at 1131 quoting *Bancroft & Masters, Inc. v. Augusta Nat'l. Inc.*, 223

23  F.3d 1082, 1087 (9th Cir. 2000).  A jurisdictionally sufficient amount of harm

24  occurs when it is foreseeable that the infringed work derives value from the market

25  in the target forum, regardless of where the plaintiff resides.  *See Mavrix*, 647 F.3d

26  at 1231-33.  The Ninth Circuit's language in *Mavrix* is directly on point here:

27          It was foreseeable that this economic loss would be inflicted not

28          only in Florida, [Plaintiff's] principal place of business, but also in

California.  A substantial part of the photos' value was based on the fact that a significant number of Californians would have bought publications such as *People* and *Us Weekly* in order to see the photos.  Because [Defendant's] actions destroyed this California-based value, a jurisdictionally significant amount of [Plaintiff's] economic harm took place in California.

*Mavrix*, 647 F.3d at 1231-32.  Moreover, Plaintiffs stand to suffer more harm than was present in *Mavrix* because of the high potential that their reputations will be damaged by any inferiority, technical problems or other unsatisfactory experiences that California customers may have while attempting to view Defendants' infringing stream and that they may mistakenly associate with Plaintiffs.

The second and third prongs of the specific jurisdiction analysis are also satisfied.  Plaintiffs' claims arise directly out of Defendants' forum-related activities, *i.e.*, the infringing websites.  Also, there are no facts in the record that suggest exercising personal jurisdiction over Defendants would be unreasonable or unfair.  To the contrary, at least some Defendants have expressly *consented* to personal jurisdiction in California federal court by contracting with Namecheap.  Although their specific consent is limited to the terms of the contract, the fact that they consented to jurisdiction in this Court in a contract for services that they need to keep the infringing <boxinghd.net> website online underscores the fact that it would not be unreasonable for this Court to exercise jurisdiction over them in this lawsuit that relates to websites including <boxinghd.net>.  Accordingly, this Court has personal jurisdiction over Defendants.

**B.      The Standard for Issuance of a Temporary Restraining Order and Preliminary Injunction to Prevent Copyright Infringement**

This Court has the authority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  In cases such as this where immediate court intervention is

1   necessary to prevent the irreparable harm that Plaintiffs will suffer if Defendants are

2   allowed to stream this one-time live event, entry of a temporary restraining order is

3   appropriate if Plaintiffs establish:  (1) a likelihood of success on the merits; (2) a

4   likelihood of irreparable harm in the absence of immediate relief; (3) that the

5   balance of equities tips in Plaintiffs' favor; and (4) that an injunction is in the public

6   interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct.

7   365 (2008), *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n.

8   7 (9th Cir. 2001).

9          Temporary restraining orders and preliminary injunctions are not merely

10   appropriate when the plaintiff proceeds under the Live Broadcast Exemption; they

11   are typically the only way plaintiffs can avoid the severe and irreparable damage

12   caused by infringers such as Defendants who seek to deprive copyright owners of all

13   the benefits that come from securing exclusive rights to a highly-anticipated live

14   event.  For example, in *National Football League v. Cousin Hugo's, Inc.*, 600 F.

15   Supp. 84 (E.D. Mo. 1984), the court relied on "the concept of anticipatory

16   infringement of copyright" under the Live Broadcast Exemption to enter a

17   temporary restraining order and preliminary injunction against defendants who were

18   planning to publicly show professional football games in violation of the plaintiff's

19   exclusive rights under the Copyright Act.  Similarly in *Live Nation Motor Sports,*

20   *Inc. v. Davis*, a court exercising jurisdiction under the Live Broadcast Exemption

21   preliminarily enjoined a defendant from providing links to unauthorized audio

22   streams of live sporting event broadcasts in which the plaintiff owned exclusive

23   rights, and shortly thereafter granted partial summary judgment for the plaintiff that

24   the defendant infringed the plaintiff's rights under the Copyright Act by placing

25   links to the unauthorized live streams on his website.  *See* 2006 WL 3616983 (N.D.

26   Tex. Dec. 12, 2006) (preliminary injunction order); 2007 WL 79311 (summary

27   judgment order). Plaintiffs satisfy all of the requirements for immediate relief,

28   which is the only way Plaintiffs can avoid the severe damage they will suffer if

1   Defendants are allowed to proceed with their threatened infringement of Plaintiffs'

2   live Coverage of the Fight.

3   //

4   //

### C. Plaintiffs are Entitled to a Temporary Restraining Order and Preliminary Injunction to Prevent Defendants from Infringing their Rights in the Coverage

#### 1. Plaintiffs are Likely to Succeed on their Claims

Insofar as Plaintiffs are entitled to broad injunctive relief for each of their three claims, preliminary injunctive relief is appropriate if they establish that they are likely to prevail on even one of their three claims. *See* 17 U.S.C. 502(a). But immediate relief is particularly appropriate in this egregious case because Plaintiffs are likely to prevail on *all* of their claims.

##### (a) Plaintiffs are Likely to Prevail on their Claim for Direct Copyright Infringement

A plaintiff asserting a claim for direct copyright infringement must prove: 1) that it is the legal or beneficial owner of a valid copyright; and 2) that the defendant violated or will violate at least one of the exclusive rights owned by the plaintiff as the legal or beneficial copyright holder. *See* 15 U.S.C. §§ 411(c), 501(b); *see also A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001).

Under the Live Broadcast Exemption, the fact that the work at issue has not yet been fixed does not prevent the plaintiff from establishing that it is likely to prevail on its claims if the defendant proceeds with its threatened infringement. *See, e.g.*, *Live Nation Motor Sports, Inc.*, 2006 WL 3616983, at *3 (finding that plaintiff who sued based on the Live Broadcast Exemption was likely to prevail on the merits of its claim as to future audiocasts of live sporting events and stating "[that plaintiff] does not currently hold copyright registrations for the shows that have yet to take place will not preclude it from obtaining protections afforded to copyright owners under the copyright act, so long as it complies with the statutory formalities within a

1  prescribed time."); *Ga. Television Co. v. TV News Clips of Atlanta, Inc.*, 718 F.

2  Supp. 939, 946 (N.D. Ga. 1989) (preliminary injunction issued where the plaintiff

3  "perfected its copyrights in its [live] broadcasts" through "service of advance

4  notices of potential infringement" on the defendants and the defendants "intend[ed]

5  to continue to copy and sell plaintiff's future newscasts.").

6        Plaintiffs are likely to prevail on their claim for direct copyright infringement.

7  First, the Coverage is undoubtedly entitled to copyright protection.  It is black letter

8  law that telecasts of live sporting events are "entitled to copyright protection. The

9  Copyright Act was amended in 1976 specifically to insure that simultaneously-

10  recorded transmissions of live performances and sporting events would meet the

11  [Copyright] Act's requirement that the original work of authorship be 'fixed in any

12  tangible medium of expression.'"  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d

13  841, 847 (2d Cir. 1997); *see also* 1976 *U.S. Code Cong. & Admin. News* at 5773.

14  Plaintiffs' also own the copyright in the Coverage, as evidenced by the Espinoza

15  Decl. and the Notice that Plaintiffs sent to Defendants prior to filing this action.

16  (*See* Varas Decl., ¶ 3, Ex. A.)

17        Plaintiffs are certain to establish the second element of their claim for direct

18  infringement because Defendants are threatening to reproduce, distribute and/or

19  publicly perform the Coverage in its entirety.  *See Live Nation Motor Sports, Inc.*,

20  2007 WL 79311, at *3 (copyright owner was entitled to summary judgment that

21  defendant infringed its copyright by "provid[ing] live audio webcasts" of sporting

22  events; *see also Warner Bros. Entm't. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1008-

23  1012 (C.D. Cal. 2011) (provider of unauthorized on-demand movie streaming

24  service violated performance right of copyright owners).

25        **(b)**    **Plaintiffs are Likely to Succeed on their Claim for**

26                   **Contributory Copyright Infringement**

27        To prevail on their claim for contributory infringement, Plaintiffs must

28  establish both ownership of a valid copyright (which they will do for the reasons set

1    forth in the previous section) and that Defendants have or will intentionally induce,

2    cause or materially contribute to direct infringement by others.  *See Metro-Goldwyn-*

3    *Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162

4    L. Ed. 2d 781 (2005); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

5    Liability for contributory copyright infringement attaches to defendants with "*actual*

6    *knowledge* and those who *have reason to know* of direct infringement."  357 F.3d at

7    1076 (emphasis in original).

8         Plaintiffs are extremely likely to establish the elements required for

9    contributory infringement as well.  First, to the extent Defendants intend to obtain

10   the unauthorized stream from a third party (which is how these unauthorized

11   streaming sites typically operate set forth in the Brasich Decl. at ¶ 5), Defendants

12   will both directly infringe Plaintiffs' rights by displaying the stream on their

13   websites, and materially contribute to direct infringement by third parties whose

14   unauthorized stream will reach Defendants' customers.  Conversely, to the extent

15   Defendants know or have reason to know that third parties will relay or otherwise

16   distribute their unauthorized stream to others, they will materially contribute to

17   direct infringement by those downstream parties.  *See, e.g.*, *Twentieth Century Fox*

18   *Film Corp. v. iCraveTV*, 53 U.S.P.Q.2d 1831, 1837 (W.D. Pa. 2000) (Defendants

19   engaged in contributory infringement by streaming Plaintiffs' copyrighted works on

20   the Internet with knowledge that third parties would use their streams to further

21   infringe).  The fact that Defendants claim to use CPAleads' "GotLinks" service,

22   which monetizes websites through, among other things, social media sharing and

23   driving traffic to its customers' sites underscores the likelihood that Plaintiffs will

24   prevail on their claim of contributory infringement.  *See, e.g.*, *Nat'l Photo Grp., LLC*

25   *v. Allvoices, Inc.*, No. C-13-03627 JSC, 2014 WL 280391, at *6 (N.D. Cal. Jan. 24,

26   2014) (facilitating infringement through the use of social media among other things

27   sufficient to support a claim of contributory infringement).

28         Plaintiffs are also likely to establish that Defendants intend to knowingly

MEMORANDUM OF POINTS AND AUTHORITIES                                            19
CASE NO. 2:15-CV-03147

induce, cause and/or materially contribute to third party infringement because their sites have no purpose but to relay and disseminate the infringing stream, including to other infringers.

**(c)   Plaintiffs are Likely to Succeed on their Claim for Vicarious Copyright Infringement**

To prevail on their claim for vicarious infringement, Plaintiffs must establish that Defendants have the right and ability to supervise the direct infringement that occurs on and through their websites and also have a direct financial interest in the infringement. *A&M Records, Inc.*, 239 F.3d at 1023. Both of these elements are easily satisfied here.

Defendants' use of the "GotLinks" service to monetize <sportship.org> (which users are redirected to when they click to watch the stream on <boxinghd.net>) is more than sufficient for the Court to find that Plaintiffs are likely to establish the financial interest element of this claim. But the element is also independently satisfied because the Ninth Circuit has held that "financial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'" *A&M Records, Inc.*, 239 F.3d at 1023, quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996). Given the high profile and intense level of anticipation that has accompanied the Fight and the Coverage, there is no doubt that the Coverage acts as a "draw" that attracts users to Defendants' websites. Indeed, one need look no further than the "Mayweather vs. Pacquiao" banner that Defendants have placed at the top of their <boxinghd.net> website to see that Defendants are actively seeking to capitalize on the extraordinary level of interest in the Fight to draw users to their infringing sites. (*See* Brasich Decl., ¶ 7, Ex. A.)

Defendants have the right and ability to supervise the direct infringement occurring on and through their websites because they control what content their websites display. "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to

supervise." *A&M Records, Inc.* 239 F.3d at 1023, citing *Fonovisa*, 76 F.3d at 262.

### 2.   Plaintiffs will Suffer Irreparable Harm if the Court does not Grant Immediate Relief

The irreparable harm Defendants will cause to Plaintiffs is both egregious and undeniable.  The Espinoza Decl. explains how Defendants' infringement will cause Plaintiffs harm in numerous ways.  Among other things, Defendants are threatening to strip Plaintiffs of exclusive control over Coverage of one of the most valuable live sports events in history, including but not limited to depriving Plaintiffs of the critical right of first publication.  (Espinoza Decl., ¶¶ 15-19.)  The threatened loss of such exclusivity has been held to constitute irreparable harm for purposes of preliminary injunctive relief under the Live Broadcast Exemption because, among other things, it threatens to interfere with the copyright owner's ability to hold itself out as the exclusive source of the event.  *See Live Nation Motor Sports, Inc.*, 2006 WL 3616983, at *5.

Defendants' threatened infringement also prevents Plaintiffs from exercising quality control over the presentation of the Coverage.  (Espinoza Decl., ¶ 19.) Such deprivation constitutes irreparable harm because, among other reasons, it threatens to damage Plaintiffs' reputation among consumers who will associate any technical problems, inferior quality, or other unsatisfactory experiences they may have while viewing the infringing stream with Plaintiffs.  Defendants also will deprive Plaintiffs of revenue that will be impossible to calculate because there is no way of knowing how many people would have purchased licensed pay per view access to the Coverage but for Defendants' infringement.  (*Id.*, ¶ 17.)

Such damage more than satisfies the irreparable harm requirement for preliminary injunctive relief.  Indeed, this case is markedly similar to *Warner Bros. Entertainment*, in which a court in this District closely examined the myriad ways in which the unauthorized online dissemination of copyrighted motion pictures irreparably harms the copyright owner.  *See* 824 F. Supp. 2d at 1012-14.  In that

1   case, the court granted a preliminary injunction to stop the defendants from

2   operating an unauthorized online movie "rental" service that allowed users to stream

3   copies of movies directly to their computer screens.  *Id.* at 1006-08.  In granting the

4   preliminary injunction, the court emphasized that harms such as depriving rights

5   owners of control over their intellectual property and the way in which it is

6   presented, interfering with their business relationships and customer goodwill, and

7   depriving rights owners of revenue that cannot be reasonably estimated (and that

8   defendants would be unable to pay in any event) are irreparable and justify the

9   imposition of preliminary injunctive relief.  824 F. Supp. 2d at 1012-14; *see also*

10  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217

11  (C.D. Cal. 2007).

12  ### 3.      The Balance of Equities Tips Sharply in Plaintiffs' Favor

13  Defendants cannot argue that a temporary restraining order and/or preliminary

14  injunction will cause them to suffer any legitimate hardship.  The Ninth Circuit has

15  long held that a defendant "cannot complain of the harm that will befall it when

16  properly forced to desist from its infringing activities. 'Where the only hardship that

17  the defendant will suffer is lost profits from an activity which has been shown likely

18  to be infringing, such an argument in defense "merits little equitable

19  consideration[.]'"  *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir.

20  1995), quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600,

21  612 (1st Cir. 1988).

22  Here again, *Warner Bros.* provides a useful reference point.  In that case, the

23  court found that the balance of equities tipped "sharply in [the plaintiff's] favor"

24  notwithstanding the defendant's assertion that a preliminary injunction would

25  "significantly harm, if not destroy" its on-demand video distribution business.  824

26  F. Supp. 2d at 1014.

27  ### 4.      An Injunction is in the Public Interest

28  There is also no doubt that an injunction would serve the public interest.

1    "'[I]t is virtually axiomatic that the public interest can only be served by upholding

2    copyright protections and correspondingly, preventing the misappropriation of

3    skills, creative energies, and resources which are invested in the protected work.'"

4    *Warner Bros.*, 824 F. Supp. 2d at 1015, quoting *Apple Computer, Inc. v. Franklin*

5    *Computer Corp.,* 714 F.2d 1240, 1255 (3rd Cir. 1983).  As the court in this District

6    observed in another case involving the unauthorized online dissemination of

7    copyrighted works, any interest the public may have "in receiving copyrighted

8    content for free is outweighed by the need to incentivize the creation of original

9    works."  *Metro-Goldwyn-Mayer Studios*, 518 F. Supp. 2d at 1222.

### 5.    The Scope of Plaintiffs' Requested Injunction is Reasonable and Within the Court's Discretion

12       The Court has broad discretion to fashion both preliminary and permanent

13   injunctions "on such terms as it may deem reasonable to prevent or restrain

14   infringement of a copyright."  17 U.S.C. § 502(a); *see also Modtech, Inc. v.*

15   *Designed Facilities Constr., Inc.*, 51 U.S.P.Q.2d 1206, 1207 (C.D. Cal. 1999).  This

16   includes the authority to preliminarily and permanently enjoin not only Defendants,

17   but also their officers, agents, servants, employees, attorneys and all other persons

18   acting in active concert or participation with any of them.  Fed. R. Civ. P. 65(d)(2).

19       Plaintiffs' requested injunction is well within the scope of the Court's broad

20   equitable authority.  As set forth in further detail in the proposed order submitted

21   herewith, Plaintiffs' application seeks entry of a temporary restraining order and

22   preliminary injunction that will prevent Defendants and their agents, servants,

23   employees, officers, attorneys, successors, licensees, partners, and assigns and all

24   those acting in active concert or participation with any of them from infringing

25   Plaintiffs' exclusive rights in the Coverage.  The requested injunction is narrowly

26   tailored and appropriate to protect Plaintiffs' legitimate rights.

27       Plaintiffs also request that the Court expressly require all service providers

28   whose services will enable or facilitate Defendants' anticipated infringement to

suspend all services with respect to <boxinghd.net> and/or <sportship.org>, from 8:45 p.m. Eastern Time on May 2, 2015 until 6:00 a.m. Eastern Time on May 3, 2015.  This includes Namecheap.com, Inc., Enom, Inc., Hostwinds, LLC. as well as all other hosts, registrars and name servers and also all providers who enable video delivery services to and from Defendants' infringing websites including all site acceleration providers, providers of video delivery resources, and providers of computer and network resources through which video transits to or from Defendants' infringing websites.  In other words, Plaintiffs request that the Court include specific and narrowly tailored language directed to Defendants' service providers so that Defendants cannot flout the Court's order while the live Coverage is being telecast.[3]  Such an order is appropriate given the egregious nature of Defendants' conduct and their failure to respond to Plaintiffs' Notice, and is consistent with the relief authorized by 17 U.S.C. § 512(j).  The requested injunction is particularly appropriate because the *only* content currently on <boxinghd.net> and <sportship.org> promotes the infringing stream.  Thus, taking the sites offline for a brief period of time will not interfere with any non-infringing activities.

### D.    The Court Should Require No Bond or, in the Alternative, a Minimal Bond

It is well established in the Ninth Circuit that "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any.*'" *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003) quoting and adding emphasis to *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir. 1999)).  In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Joegensen*, 320 F.3d at 919.  Plaintiffs respectfully submit that the Court should

---

[3] Plaintiffs' requested order would enjoin Defendants and all others acting in concert with them from infringing Plaintiffs' rights in the Coverage after the live event as well, and reserve the right to seek further relief from the Court if necessary to enforce the Court's order after 6:00 a.m. on May 3, 2015.

exercise its discretion to dispense with the filing of a bond in this case.  There is no realistic likelihood of harm to Defendants in this case because there is no evidence that Plaintiffs' requested injunction will cause Defendants any harm other than stopping their unlawful conduct.

### E.    Defendants Have Received Notice and *Ex Parte* Relief is Warranted

Plaintiffs respectfully submit that *ex parte* relief is appropriate in this case. The harm that Plaintiffs will suffer if Defendants are permitted to stream the live Coverage will be severe and irreparable.  It is the very nature of live sporting events that they only occur live one time.  There is no doubt that Plaintiffs' cause will be irreparably prejudiced if their application were to be heard on the normal motion schedule.  *See Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F.Supp. 488, 492 (C.D. Cal. 1995).  If this application were placed on the normal motion schedule it would not be heard until long after the Fight – and Defendants' infringement of the live Coverage o has occurred.  Plaintiffs have also provided Defendants with notice of this application, as set forth in the Varas Decl. submitted herewith.

## IV.    <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court grant their application in full.

DATED:  April 28, 2015        Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP


By:      /s/ Dennis L. Wilson
         DENNIS L. WILSON

Attorneys for Plaintiffs SHOWTIME
NETWORKS INC., HOME BOX OFFICE, INC.,
MAYWEATHER PROMOTIONS, LLC, and
TOP RANK, INC.